IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ETHON D. BEGOUN, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | No. 09 C 1555 |
| vs. | ) | |
| | ) | Jeffrey T. Gilbert |
| MICHAEL J. ASTRUE, | ) | Magistrate Judge |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Claimant Ethan D. Begoun ("Claimant") brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying Claimant's request for waiver of repayment of an overpayment of disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 404(a). An overpayment of disability insurance benefits occurs when a recipient receives more than the amount he is entitled to receive and becomes obligated to refund the excess amount to the Social Security Administration ("SSA"). 42 U.S.C. § 404(a). The SSA may waive the recovery of an overpayment only if both of the following are true: (1) the recipient is without fault in causing the overpayment, and (2) recovery either defeats the purposes of the Social Security Act or goes against principles of equity and good conscience. 42 U.S.C. § 404(b).

This matter is before the Court on Claimant's motion for summary judgment or remand [Dkt.#19]. Claimant argues that the Administrative Law Judge's ("ALJ") decision denying his request for waiver of repayment of overpayment should be reversed and/or that the case should be remanded for further proceedings. Claimant raises the following issues: (1) whether the ALJ erred in failing to recognize as reasonable Claimant's subjective belief regarding the

computation of his trial work period; (2) whether the ALJ erred in failing to consider the impact of Claimant's ongoing medical conditions upon his understanding of his reporting responsibility concerning his trial work period at the time the overpayments occurred; and (3) whether the ALJ's finding that Claimant is able to repay the overpayment is supported by substantial evidence. For the reasons set forth below, Claimant's motion is granted. The decision of the Commissioner of Social Security is reversed, and this matter is remanded to the SSA for further proceedings consistent with this Memorandum Opinion and Order.

## I. BACKGROUND

### A. Procedural History

Claimant applied for disability insurance benefits on January 23, 1992, alleging he was disabled since April 28, 1990. (R.24-27). Claimant was granted disability insurance benefits beginning in January 1991. (R.17). Claimant received disability insurance benefits from January 1991 until August 2002. (R.7, 54-56). The SSA determined on June 20, 2002, however, that Claimant had demonstrated the ability to engage in substantial gainful activity, that his disability had ceased in January 1997 after he had completed a nine-month trial work period comprised of periods when he was employed by others and self-employed, and that his eligibility for disability insurance benefits ended three months later on March 31, 1997. (R.17, 47-49, 50-52). The SSA stopped making payments to Claimant in August 2002 and determined on September 9, 2002 that, for the months of April 1997 through July 2002, Claimant had been overpaid $64,309 and each of his two children had been overpaid $16,058 for a total overpayment to his children of #32,116. (R.17).[1]

---

[1] The total of more than $96,000 apparently includes more than 50 social security disability benefit checks that Claimant received but did not cash and eventually returned to the SSA. *See* note 2 *infra*.

In October 2002, following receipt of the SSA's September 9, 2002 letter, Claimant notified the SSA that he was requesting a waiver of recovery of the overpayment. (R.17). Claimant asserted that he was without fault in causing the overpayment and could not afford to repay to the SSA the overpayment he had received. (R.63-65, 66-73). In the fall of 2002, Claimant also began refunding $10 per month to the SSA. (R.22).

In June 2003, an Administrative Claims Representative from the SSA made a preliminary determination that recovery from Claimant of the overpayment could not be waived. (R.17, 139-140). After conducting a personal conference with Claimant and his attorney in March 2004 and allowing Claimant time to submit additional evidence, the SSA determined in May 2004 that it could not waive recovery of the overpayment. (R.17, 152-161). After receiving notice of the SSA's personal conference decision in May 2004, Claimant timely filed a request for a hearing before an ALJ. (R.17, 162).

ALJ Edward Pappert conducted a hearing on May 26, 2005 at which Claimant appeared and testified with his attorney present. (R.349-375). After the hearing, Claimant's counsel submitted additional information, including an affidavit from Claimant's wife, in July 2005 and May 2006. (R.316-337). On September 29, 2006, the ALJ issued a decision finding Claimant was not without fault in causing the overpayment of disability insurance benefits and denied his request for waiver of repayment. (R.17-23). On January 30, 2009, the Appeals Council denied a request for review, making the ALJ's decision the final decision of the Commissioner. (R.5-8). Claimant subsequently filed suit in this Court pursuant to 42 U.S.C. §405(g), seeking review of the ALJ's decision denying waiver of repayment of the overpayment of disability insurance benefits.

## B. Factual History

Claimant applied for disability insurance benefits on January 23, 1992, alleging he had been disabled since April 28, 1990 as a result of multiple back surgeries. (R.24-27). Claimant was granted disability insurance benefits beginning in January 1991. (R.17). Claimant did not work at all from 1991 through 1995. (R.225). He attempted to return to work beginning in April 1996. (R.205-08). During the nine-month period of time between April 1996 and the end of December 1996, Claimant worked briefly for Pasquesi Plumbing and Glenview Plumbing and then apparently was self-employed in a business he began and operated with his wife called Ethon's Home Maintenance ("EHM"). (R.196, 225, 321-322).

On April 10, 1996, Claimant completed a Work Activity Report for the SSA detailing his employment at Pasquesi Plumbing. (R.205-208). In that Work Activity Report, Claimant also articulated his then-understanding of the trial work period and requested that someone from the SSA contact him to explain how the trial work period was applied. (R.207). He explained:

> I was told by social sec. that I would be able to continue to try and work for up to nine months and still receive benefits. If I can make it, working nine months then I would discontinue social security. Can you please have someone contact me on how a trail [sic] work period works.

(R.207). On June 17, 1996, Claimant filed another Work Activity Report noting that his employment at Pasquesi Plumbing ended on June 7, 1996. (R.196). Later that year, Claimant worked for a short time for Glenview Plumbing, earning only $720. (R.225).

The Commissioner contends that Claimant was sent and he received a notice letter dated August 23, 1996, acknowledging three completed months of his trial work period and his continuing disability. (R.201). That letter also explained the trial work period as follows:

> The 9 months may be continuous or separated by periods when you do not work at all. In general, any month you earn over $75 in wages or are active in self-employment counts as a trial work month. At the end of the 9 months, a decision is made as to whether your work is substantial and gainful. If it is and work continues, benefits are stopped after an additional 3-month adjustment period. If it is not, benefits continue.

(R.202).

The record is silent as to whether Claimant received this letter. The copy of the letter in the record is addressed to Claimant at a Wilmette, Illinois address. That was Claimant's address at least as of June 10, 1996, when he submitted a Work Activity Report stating that his employment with Pasquesi Plumbing had ceased. (R.196). But the record does not disclose whether Claimant resided at that address in August 1996. At some point, Claimant moved to Northbrook, Illinois, which is the address shown on his 1997 tax return. (R.241). During oral argument on the pending motion, Claimant's counsel said she was not sure when Claimant moved from Wilmette to Northbrook, Illinois. In response to the Commissioner's argument that the August 23, 1996 letter is clear and unambiguous (Commissioner's Resp. [Dkt.#24], at 4), Claimant argues that there is no evidence in the record he received that letter. (Claimant's Reply [Dkt.#28], at 2). Claimant was not asked about the August 23, 1996 letter by the ALJ at the hearing in May 2005 nor was he questioned about where he lived at the time the letter supposedly was sent to him.

The record also is not clear as to when Claimant and his wife began operating EHM. (R.225). In her affidavit, Claimant's wife states that they began operating EHM in the mid to late 1990s. (R.321-322). SSA records show Claimant had self-employment earnings beginning in calendar year 1996. (R.28-30, 224-227). It appears from Claimant's IRS tax returns that he was self-employed from sometime in 1996 through at least 1999. (R.238-315). Claimant,

however, did not notify the SSA of his self-employment until June 5, 1999 when he submitted a Work Activity Report detailing his self-employment with EHM. (R.208-210). In that report, Claimant also stated, however, that EHM did not make any money. (R.208, 210). It is unclear what motivated Claimant to submit the Work Activity Report for his self-employment in June 1999.

In 2000, Claimant started working for Merchant's Environmental Industries ("MEI"). (R.226, 363). Following Claimant's ninth consecutive month working at MEI, he contacted the SSA to cancel his disability insurance benefits. (R.74, 362). The SSA, however, continued to send Claimant benefit checks through 2001 and into 2002 which Claimant did not cash and ultimately returned uncashed to the SSA. (R.17). Claimant thus received disability insurance benefits from April 1997 until August 2002 (R.17, 54-56) though he did not cash over 50 benefit checks he received from July 2001 through July 2002 (R.74-136, 360).

On June 20, 2002, the SSA sent Claimant a letter stating that although Claimant rightly received disability insurance benefits from January 1991 through March 31, 1997, the SSA had concluded, upon review of his work history, that his disability ceased in January 1997. The SSA determined that Claimant's nine-month trial work period began in April 1996 and ended in December 1996 (R.48), a period during which he worked at Pasquesi Plumbing and Glenview Plumbing and commenced self-employment with EHM. (R.196, 225, 321-322). The SSA thus determined that Claimant's eligibility for disability insurance benefits ceased in January 1997 and that he no longer was eligible to receive benefits as of March 31, 1997, three months after the end of his trial work period. (R.17, 47-49, 50-52). The SSA sought repayment of the overpayment of benefits paid to Claimant from April 1997 through July 2002. (R.17). Claimant does not dispute the SSA's calculation of his combined wages and self-employment income between April 1996

and December 1999 or that these amounts exceeded the regulatory thresholds. (R.21). On September 9, 2002, the SSA notified Claimant of the overpayment and demanded repayment for the benefits he and his children had received from April 1997 through July 2002. (R.17, 57).

### C. The Hearing and Record Before the ALJ

ALJ Edward Pappert conducted a hearing on May 26, 2005. Claimant testified at the hearing that he believed he did not complete his trial work period until he had worked nine consecutive months. (R.370-371). When Claimant completed working nine consecutive months for MEI in 2000, he notified the SSA that he had completed his trial work period and was no longer eligible for benefits. (R.360). Claimant articulated his understanding of the trial work period as follows: "[t]hey gave you nine consecutive months, if you can work nine consecutive months, then call up your social security office and tell them you can work." (R.370-371). Claimant claimed that he acted consistent with that understanding when he refused to cash more than 50 benefit checks he had received in 2001 and 2002 after he had notified the SSA he had completed working nine consecutive months at MEI. (R.220, 361).

When the ALJ questioned Claimant about his self-employment earnings during 1997, 1998 and 1999, Claimant testified that it was his understanding at the time, based on what he was told by his accountant and his recollection of that time period, that EHM did not make any money. (R.321, 365-373). EHM was a "matchmaker" or middleman of sorts between people who needed home repair services and tradesmen or handymen who could do the work. (R.19, 322, 362-363) According to Claimant, "[b]y the numbers, as you can see, it's not a living, but I tried that for a number of years on loans . . . on you know, money borrowed from my dad. For a couple of years we just tried to make that work. It didn't pan out." (R.363).

Claimant testified that neither he nor his wife believed EHM was making money. (R.321-22, 367). Both Claimant and his wife testified that money generated by EHM primarily was used to pay-off loans from Claimant's parents or was put back into the business. (R.321-322, 371-372). Claimant testified that when they needed money, his wife would call the accountant, who was a friend of Claimant's parents, and he would tell her how much they could take out of the business. (R.371-372). Claimant further testified that he could not really describe the process of how and when they would take money from the business because "that period is such a blur to me" as a result of the narcotic pain medication he was taking for his back. (R.372-373).

Claimant's wife described their involvement with EHM and their dealings with the accountant who kept the books for the business as follows:

> In order to set up the business and keep it going we borrowed a tremendous amount of money from our parents. Money that came in was either put back into the business or used to pay back the parents. The books for the business and all of the tax preparation was done by the accountant. He prepared the forms and told us where to sign and we signed. The accountant was a personal friend to my in-laws, so it never occurred to us to question him or his skills. We assumed he had our best interest at heart. Every so often the accountant would allow us to draw some money from the business to pay for necessities such as groceries but never very much and we were told by the accountant that the business was losing money. We had no reason to doubt the accountant's word that the business was not making money because we indeed were not getting by, and had to continue living on credit.

(R.321-322) (emphasis added).

Claimant also testified that all financial documents for EHM were handled by the accountant, including tax returns, and he had no detailed knowledge of EHM's financial status. (R.371-372). According to Claimant's wife, they often signed documents prepared by the accountant without reading them. (R.321). Copies of Claimant's federal tax returns in the record

indicate that Claimant and his wife had reportable business income from EHM years 1997, 1998, and 1999 of $13,680, $21,904, and $9,413, respectively. (R.241, 261, 295). The tax returns, however, also show that Claimant and his wife had no net taxable income in 1997 and 1999 and that they received tax refunds in those years. (R.242, 296).

Finally, Claimant's wife testified that her family was unable to repay the overpayment to the SSA. She said, "[W]e need all of our monthly income to pay for our bills and to slowly try to payoff all of our outstanding debt including medical bills, credit cards, and family loans." (R.322).

**D. The ALJ's Decision**

On September 29, 2006, the ALJ issued his decision finding Claimant was not without fault in causing the overpayment of disability insurance benefits and denied his request for waiver of repayment. (R.17-23). The ALJ was not persuaded by Claimant's argument that he did not understand the trial work provisions of the Social Security Act. (R.20). The ALJ found that the SSA's August 23, 1996 letter to Claimant contained a full and clear explanation of the trial work period provisions. (R.20). The ALJ concluded that "[s]ince the Administration's letter [dated August 23, 1996] clearly stated that the 9 months of the trial work period either could be continuous or separated by periods in which claimant did not perform any work, the burden of reporting any subsequent work activity shifted to claimant after he received the necessary reporting instructions." (R.20).

The ALJ also found no merit in Claimant's purported lack of knowledge that EHM was profitable as a justification for Claimant's failure to report his self-employment work activities. (R.21). The ALJ concluded, "[s]ince claimant and his wife were both required to sign their Federal tax returns in order to file them, they would have known at least by the date on which

they signed the tax returns not only that the business was profitable but also that the amount of the profit was substantial." (R.21).

In addition, the ALJ found that even if Claimant was without fault in causing the overpayment, repayment did not defeat the purpose of Title II, and therefore, Claimant also failed the second step of the waiver analysis. (R.21). The ALJ determined that Claimant's family's current average monthly income exceeded the average monthly expenses of the household by a substantial amount, and therefore, repayment would not deprive the family of income required for ordinary and necessary living expenses. (R.21). Although Claimant reported that his family's monthly food expense was $1,300, the ALJ found that a more reasonable estimate of the cost of food for a family of four is $800 per month (based on an average of $200 per person). (R.21). After excluding the difference of $500 per month from Claimant's monthly expenses, the ALJ determined that Claimant's monthly income exceeded his expenses by $300. (R.21).

On January 30, 2009, the Appeals Council denied a request for review, making the ALJ's decision the final decision of the Commissioner. (R.5-8). Claimant filed suit in this Court, seeking review of the denial of waiver of repayment. The parties have submitted briefs on Claimant's motion for summary judgment or remand, and the Court heard oral argument on November 29, 2010. This matter is ripe for decision.

## II. STANDARD OF REVIEW

### A. Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Judicial review is limited to determining whether the

decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the ALJ's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Moreover, a reviewing court cannot uphold the ALJ's decision based on evidence in the record upon which the ALJ did not rely unless the decision is so "overwhelmingly supported by the record" that remand for further consideration of the evidence would be a waste of time. *Spiva v. Astrue*, -- F.3d --, 2010 WL 4923563, at *7 (7th Cir. 2010).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence." *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**B. Legal Standard for Waiver of Recovery of Overpayment**

An overpayment of disability insurance benefits occurs when a recipient receives more than the amount he is due and thereby becomes obligated to refund the excess amount to the SSA.

42 U.S.C. § 404(a); 20 C.F.R. §§ 404.501-502. The SSA may waive the recovery of an overpayment only if both of the following are true: (1) the recipient is without fault in causing the overpayment; and (2) recovery either defeats the purposes of the Social Security Act or goes against principles of equity and good conscience. 42 U.S.C. § 404(b); 20 C.F.R. § 404.506; *see also Banuelos v. Apfel*, 165 F.3d 1166, 1173 (7th Cir. 1999) (overruled on other grounds by *Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999)).

An individual is not without fault when the overpayment resulted from either (1) an incorrect statement made by the recipient that he knew or should have known was false, (2) failure to furnish information that the recipient knew or should have known was material, or (3) acceptance of a payment that he knew or could have been expected to know was not the correct amount. 20 C.F.R. § 404.507(a)-(c). When determining whether a recipient is without fault in causing the overpayment of benefits, the SSA must take into account any physical, mental, educational, or linguistic limitations such individual may have, including any lack of facility with the English language. 42 U.S.C. § 404(b); 20 C.F.R. § 404.507. " 'The decision which must be reached in a fault determination is highly *subjective,* highly dependent on the interaction between the intentions and state of mind of the claimant and the peculiar circumstances of his situation.' " *Lozano v. Apfel*, 1999 WL 731702, at *4 (N.D. Ill. 1999) (emphasis original), citing *Jefferson v. Bowen*, 794 F.2d 631, 633 (11th Cir. 1986) (quoting *Harrison v. Heckler*, 746 F.2d 480, 482 (9th Cir. 1984)).

If a recipient is without fault, the SSA may waive recovery of the overpayment only if repayment also would defeat the purpose of the Social Security Act or go against principles of equity and good conscience. 42 U.S.C. § 404(b). Recovery of an overpayment defeats the purpose of the Social Security Act if it would deprive the individual of funds needed for ordinary

and necessary living expenses. 20 C.F.R. § 404.508. In addition, repayment of the overpayment would be against equity and good conscience if the individual either (1) changed his position for the worse, or relinquished a valuable right, because of reliance on a notice that a payment would be made or because of the overpayment itself, or (2) was living in a separate household from the overpaid person at the time of the overpayment and did not receive the overpayment. 20 C.F.R. § 404.509(a). The individual's financial circumstances are immaterial to the question of whether repayment would run "against equity and good conscience." 20 C.F.R. § 404.509(b).

While the SSA has the burden of proving the existence of an overpayment, *Wilkening v. Barnhart*, 2004 WL 1005718, at *5-6 (N.D. Ill. 2004), *affirmed*, 139 Fed. Appx. 715, 2005 WL 1317327 (7th Cir. 2005), the recipient has the burden of proving that he is entitled to a waiver of repayment of an overpayment. *Banuelos,* 165 F.3d at 1173; *Pliley v. Sullivan,* 892 F.2d 35, 39 (6th Cir. 1989). Even if the SSA is at fault in making the overpayment, the recipient is not absolved of liability if he is found to be at fault in causing or accepting the overpayment. *See* 20 C.F.R. § 404.507.

## III. ANALYSIS

It is a serious matter to order someone to repay the Government a substantial sum of money he mistakenly was overpaid over a period of years when he claims he did not understand he was being overpaid and would suffer economic hardship if compelled to pay back the money he received. On the other hand, if the person who received the overpayment is not without fault in causing the overpayment to occur, the law demands he repay it. That is the case even if the SSA also bears some responsibility for the overpayment.

In this case, the ALJ's order compelling Claimant to repay the overpayment rests primarily on two pieces of evidence in the record: (1) an August 23, 1996 letter addressed to Claimant there